# DISTRICT COURT OF APPEAL OF FLORIDA
## SECOND DISTRICT

———————————————

ROBERT C. GUNTHER; JAYNE C. GUNTHER; and
HIGHPOINT TOWER TECHNOLOGY, INC., a Delaware corporation,

Appellants,

v.

MORGAN, LEWIS & BOCKIUS LLP, a Pennsylvania limited
liability partnership,

Appellee.

No. 2D2024-2142

———————————————

July 8, 2026

BY ORDER OF THE COURT:

Upon consideration of Appellants' Motion for Rehearing, Certification of Question, and for Written Opinion filed on February 4, 2026,

IT IS ORDERED that the motion for written opinion is granted to the extent that the opinion dated January 2, 2026, is withdrawn and the attached opinion is substituted therefor. Appellants' motion for rehearing and certification is denied. Appellee's response is noted.

I HEREBY CERTIFY THE FOREGOING IS A
TRUE COPY OF THE ORIGINAL COURT ORDER.

MARY ELIZABETH KUENZEL, CLERK

# DISTRICT COURT OF APPEAL OF FLORIDA
## SECOND DISTRICT

_____

ROBERT C. GUNTHER; JAYNE C. GUNTHER; and
HIGHPOINT TOWER TECHNOLOGY, INC., a Delaware corporation,

Appellants,

v.

MORGAN, LEWIS & BOCKIUS LLP, a Pennsylvania limited
liability partnership,

Appellee.

No. 2D2024-2142

_____

July 8, 2026

Appeal from the Circuit Court for Hillsborough County; Darren D. Farfante, Judge.

Adam P. Merrill of Watershed Law LLC, Chicago, Illinois; Scott F. Hessell of Sperling Kenny Nachwalter LLC, Chicago, Illinois; and Scott C. Ilgenfritz of Johnson, Pope, Bokor, Ruppel & Burns, LLP, Tampa, for Appellants.

James P. Fogelman, Nancy E. Hart, and Shannon Mader of Gibson, Dunn & Crutcher LLP, Los Angeles, California; and Fred C. ("Kip") Marhsall, II, and Joshua C. Webb of Hill Ward Henderson, Tampa, for Appellee.

ROTHSTEIN-YOUAKIM, Judge.

Robert Gunther, Jayne Gunther, and Highpoint Tower Technology, Inc., appeal a final summary judgment determining that the statute of limitations barred their claims against Morgan, Lewis & Bockius, LLP, for aiding and abetting fraud and breach of fiduciary duty and for civil

conspiracy to commit fraud and breach of fiduciary duty. They argue that the statute of limitations did not begin to run on their claims until the Internal Revenue Service first obtained a judgment against them. The trial court disagreed, and so do we. On this record, the "finality accrual rule," as extended in *Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*, 202 So. 3d 859 (Fla. 2016), does not apply to the Gunthers' and Highpoint's claims.

*Background*

*The scheme*

The Gunthers are the sole shareholders of Highpoint, which operated a communications tower business. In 1999, the Gunthers sold Highpoint's assets for $50 million.[1] Because the capital gains on that sale were substantial, the Gunthers and Highpoint were faced with millions of dollars in tax liability, and so they searched for ways to reduce or eliminate their tax bill.

BDO Seidman, LLP (n/k/a BDO USA, LLP), an accounting firm with a dedicated tax advisory group, was then marketing an "investment strategy" to high-income individuals like the Gunthers. That strategy involved purchasing offsetting long and short options in the foreign currency markets and then transferring them to a partnership. While BDO claimed it was possible to make money on currency trades using this strategy, the real point was to manufacture tax losses for the partners through the use of a partnership structure, which losses could be claimed by the partners when the partnership was unwound.

---

[1] We derive this factual background from the summary judgment record, which we construe in the light most favorable to the Gunthers and Highpoint. *See G & G In-Between Bridge Club Corp. v. Palm Plaza Assocs.*, 356 So. 3d 292, 297 (Fla. 2d DCA 2023).

As the Supreme Court noted in *United States v. Woods*, 571 U.S. 31, 35 (2013), "the alchemy at the heart of an offsetting-options tax shelter" is how the taxpayers "calculate[] the tax basis of their interests in the partnerships." "Tax basis is the amount used as the cost of an asset when computing how much its owner gained or lost for tax purposes when disposing of it." *Id.* (citing J. Downes & J. Goodman, Dictionary of Finance and Investment Terms 736 (2010)). "A partner's tax basis in a partnership interest . . . is tied to the value of any assets the partner contributed to acquire the interest." *Id.* at 35–36.

The Gunthers and Highpoint elected to proceed with BDO's strategy in late 1999. They paid approximately $1.3 million in "consulting" fees to an affiliate of Sentinel Capital, LLC, who acted as the "investment advisor." Sentinel set up Arbitrage Trading, LLC, as the partnership vehicle for the Gunthers and Highpoint. The partners included Sentinel, a Sentinel affiliate, a trust run by the Gunthers, and Highpoint. The Gunthers and Highpoint then purchased long euro call options through an account with AIG International, Inc., for a collective premium of approximately $21.5 million and simultaneously sold offsetting short euro call options to AIG for a collective premium of approximately $21.3 million. They then contributed those offsetting positions to Arbitrage Trading. But here's the rub. As to the options, the Gunthers and Highpoint only came out of pocket the spread between the premiums (so roughly the $200,000 difference between the premiums for the long and short euro call options). Then, before the end of 1999, the Gunthers and Highpoint withdrew from Arbitrage Trading, creating purported tax losses for the Gunthers and Highpoint of around $21.5 million (based above all on the full premium amount of the long options only, which amount the Gunthers and Highpoint never actually paid).

3

Arbitrage Trading, the Gunthers, and Highpoint, however, would not file their 1999 returns claiming those losses until late 2000.

In early 2000, meanwhile, some at BDO were beginning to question the legality of the strategy. The executives running BDO's "Tax Solutions" group (the tax executives), who reaped significant benefit from the strategy, knew that it was likely illegal. But they figured that if they could obtain an opinion from a major law firm downplaying the likelihood of illegality, they could quash the growing concern among others at BDO, continue to market the strategy to new clients, and encourage existing clients like the Gunthers to claim the purported tax benefits in their tax returns and in any subsequent disputes with the IRS.

To obtain that legal cover, the tax executives turned in part to Morgan Lewis. The attorneys that they consulted at that firm recognized immediately that the strategy was likely an illegal tax shelter. Morgan Lewis lawyers noted that the "tax solutions" were "too good to be true," were "dubious," and did not pass the " 'smell' test of experts." One Morgan Lewis attorney noted several "uglies," including "enormous losses and no apparent profit motive." Morgan Lewis commented in an early meeting with the tax executives that "someone wanting to make a [criminal] case could."

Then, in August 2000, the IRS issued a warning that tax shelters involving "transactions calling for the simultaneous purchase and sale of offsetting options which were then transferred to a partnership" could give rise to criminal liability. Morgan Lewis internally concluded that BDO's strategy was essentially identical to the tax shelters flagged in the IRS notice.

But as notes of a conference between the tax executives and a principal Morgan Lewis tax attorney demonstrate, the tax executives

4

wanted a whitewashed opinion with a preordained conclusion that was dismissive of any illegality or potential criminal liability. Morgan Lewis, together ultimately with another law firm, facilitated that report. Now able to tell their other BDO partners and BDO's board that BDO had nothing to worry about, the tax executives not only successfully encouraged BDO to continue marketing and implementing the strategy, but they also had the cover they needed to continue to assure clients such as the Gunthers that that strategy was legal.

Consistent with BDO's strategy, when Arbitrage Trading filed its tax return in late 2000, it included as outside partnership basis the aggregate of the full premium values for the long euro call options. And in their respective tax returns, the Gunthers and Highpoint claimed their proportionate share of that amount as "partner outside basis" on their tax returns, essentially eliminating their substantial capital gains from the sale of Highpoint's assets. To put it mildly, the IRS was not amused.

In this suit against BDO and Morgan Lewis (among others), the Gunthers and Highpoint allege that they were injured by BDO's and Morgan Lewis's conduct because, among other things, they incurred out-of-pocket expenses (including consulting fees), trading losses, clean-up costs, attorney's fees, tax penalties, and interest. They allege that BDO's tax executives and Morgan Lewis cooperated to prevent the illegality of the strategy from becoming known to clients like them: officially, BDO was telling clients that the strategy was legal and that BDO would stand behind clients in any disputes with the IRS; in private, BDO and Morgan Lewis knew that the strategy was an illegal tax shelter.

The Gunthers and Highpoint, however, did not bring suit until April 2017, and they did not join Morgan Lewis as a party until July 2017. Morgan Lewis successfully argued below that New York rather than

Florida law applied to the Gunthers' and Highpoint's claims and that the statute of limitations had run under New York law well before this lawsuit was filed. The trial court, however, determined further that even under Florida law, the statute of limitations would have run as well.[2]

The Gunthers and Highpoint acknowledge that unless we apply Florida law and then, consistent with *Kipnis*, 202 So. 3d at 859, apply Florida's "finality accrual rule," they are out of luck on the statute of limitations. We assume for the purposes of this discussion that Florida law applies to the Gunthers' and Highpoint's claims. Thus, the only question we address is whether the finality accrual rule does too.

### *Kipnis*

Regarding statutes of limitation, the "general rule" is "that where an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once." *Kipnis*, 202 So. 3d at 862 (quoting *City of Miami v. Brooks*, 70 So. 2d 306, 308 (Fla. 1954)). "It is not material that all the damages resulting from the act shall have been sustained at that time and the running of the statute [of limitations] is not postponed by the fact that the actual or substantial damages do not occur until a later date." *Id.* (quoting *City of Miami*, 70 So. 2d at 308)).

---

[2] Florida's statute of limitations for fraud and breach of fiduciary duty, as well as presumably for aiding and abetting and civil conspiracy theories based on those torts, is four years. § 95.11(3)(j), (o), Fla. Stat. (2016); *Goodwin v. Sphatt*, 114 So. 3d 1092, 1094–95 (Fla. 2d DCA 2013). "An action founded upon fraud," however, benefits from application of the delayed discovery doctrine set forth in section 95.031(2)(a). *See Tejera v. Lincoln Lending Servs., LLC*, 271 So. 3d 97, 100–03 (Fla. 3d DCA 2019). Under that doctrine, the limitations period begins "running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence." § 95.031(2)(a).

The "finality accrual rule" is a narrow exception to that general rule and applies only "when the plaintiff's damages exist by virtue of an enforceable court judgment." *Kipnis*, 202 So. 3d at 862. In that circumstance, "the statute of limitations begins to run when the underlying judgment becomes final." *Id.*

Historically, courts have applied the finality accrual rule in the legal malpractice context, when a client claims that counsel committed malpractice in the handling of a prior litigation matter. *See, e.g.*, *Silvestrone v. Edell*, 721 So. 2d 1173 (Fla. 1998). The courts have reasoned that in such circumstances it would be speculative to determine whether counsel engaged in malpractice causing injury until that prior litigation has finally concluded. *See id.* at 1175 ("[A] malpractice claim is hypothetical and damages are speculative until the underlying action is concluded with an adverse outcome to the client."); *see also Fremont Indem. Co. v. Carey, Dwyer, Eckhart, Mason & Spring, P.A.*, 796 So. 2d 504, 505–07 (Fla. 2001) (holding that the statute of limitations did not begin to run on legal malpractice, breach of contract, and breach of fiduciary duty claims arising out of a law firm's handling of claims against the client's insured until the underlying litigation against the insured was final). The Florida Supreme Court extended this approach to accountant malpractice claims in *Peat, Marwick, Mitchell & Co. v. Lane*, 565 So. 2d 1323, 1327 (Fla. 1990).

*Kipnis*, 202 So. 3d at 860, in turn, extended it beyond the professional malpractice context to a scenario very much like the one we have here. In that case, taxpayers had engaged with a German bank and other entities in a tax-saving strategy known as a custom adjustable rate debt structure (CARDS) transaction. *Id.* Several months after the taxpayers' transaction concluded, the IRS determined that CARDS

7

transactions lack economic substance. *Id.* Years later, the Bank and other entities entered into a deferred prosecution agreement with the United States Department of Justice—which BDO also did in this case—admitting that they had assisted United States citizens with tax evasion through the CARDS transactions. *Id.*

The IRS then issued notices of deficiency disallowing the deductions that the taxpayers had claimed years earlier based on the transaction. The taxpayers challenged the deficiency determinations in tax court. *Id.* at 861. The tax court rejected the IRS's motion for summary judgment, determining that there was a genuine issue of material fact on whether the taxpayers had a "nontax business purpose in entering into the CARDS transaction." *Id.* (citing *Kipnis v. Comm'r*, Docket Nos. 30370–07, 30373–07, at 1–2 (T.C. Sept. 13, 2011)). Ultimately, however, following a bench trial, the tax court entered judgment in favor of the IRS and against the taxpayers, "ruling that [the taxpayers'] 'CARDS transaction lacked economic substance. It could not be profitable, and [the taxpayers] did not have a business purpose for entering into the transaction.' " *Id.* (citing *Kibler v. Comm'r*, 104 T.C.M. (CCH) 530, 2012 WL 5371787, at *13).

The taxpayers brought suit in federal court against the bank and other entities, alleging that the defendants had defrauded them by promoting CARDS transactions while pocketing huge proceeds. *Id.* at 861. The taxpayers asserted, among other claims, aiding and abetting fraud, conspiracy to commit fraud, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. *Id.* The court dismissed the claims based on the statute of limitations. *Id.* On appeal, the United States Court of Appeals for the Eleventh Circuit asked the Florida

8

Supreme Court whether the claims were timely filed under Florida law. *Id.* at 860.

The supreme court concluded that the taxpayers' claims accrued when the tax court entered judgment against them, rather than when the IRS issued the notices of deficiency. *Id.* at 866. It reached that conclusion after considering

> whether application of the finality accrual rule would (1) avoid the needless disruption of an ongoing, preexisting relationship between the plaintiff and the defendant that could occur if we required an earlier lawsuit; (2) shield a potential plaintiff from having to argue inconsistent positions in separate actions; (3) ensure that a plaintiff's damages are sufficiently real and concrete prior to a judgment in the underlying litigation; (4) encourage the efficient use of scarce judicial resources; and (5) promote the policies underlying statute of limitations in the case at bar.

*Id.* at 862–66 (quoted language at 862).

The supreme court determined that the first factor weighed against applying the rule because the relationship between the taxpayers and the bank and other entities had already ended. *Id.* at 862. The supreme court determined that the other factors weighed in favor of applying the rule, however, and it placed particular emphasis on the second and third factors. *Id.* at 863-65.

In that regard, a close reading of *Kipnis* reveals one key fact driving the analysis: that the IRS had lost its summary judgment motion in the tax court proceeding and therefore had been forced to litigate the "economic substance" issue all the way through trial and judgment. *Id.* at 863 ("This is not a case in which Kipnis and Kibler understood and believed that they had suffered injury before the tax court judgment. To the contrary, they repeatedly argued in the tax court that their CARDS transaction was economically substantive, and the tax court found that a

9

genuine dispute of material fact existed on the question.").  The supreme court recognized that absent application of the finality accrual rule, the taxpayers would have been forced to talk out of both sides of their mouths:  "[Kipnis and Kibler] should not have had to argue before the tax court that their CARDS transaction had a legitimate economic purpose, while arguing before the federal district court that the tax court was likely to find that the CARDS transaction was a sham."  *Id.*  To support that assessment, the *Kipnis* court, 202 So. 3d at 862–64, also cited *Peat Marwick,* where the accounting firm had never acknowledged error and had instead joined the taxpayer in asserting the legitimacy of the underlying transaction all the way through the litigation process.  *Peat Marwick,* 565 So. 2d at 1327.

Further, the supreme court in *Kipnis* explained that the taxpayers could not have suffered any damages until the "economic substance" issue had been determined—as long as the "economic substance issue" remained unresolved, there was a possibility that the "CARDS fees" paid by the taxpayers had actually accomplished their purposes of reducing taxes.  202 So. 3d at 864.  And until the "economic substance" issue was resolved, it was possible too that the taxpayers wouldn't owe any back taxes or interest either:

> As in *Peat, Marwick,* Kipnis and Kibler did not know for certain whether they would suffer any adverse tax consequences until their dispute with the IRS became final following the tax court's decision.  In fact, they had some reason to believe that they would prevail:  notwithstanding appellees' deferred prosecution agreement and other cases determining that CARDS lacked economic substance, the tax court found that a genuine issue of material fact existed on the question of whether Kipnis and Kibler's CARDS transaction was economically substantive.  Accordingly, their injury concerning the payment of taxes and interest was speculative and uncertain, rather than definite and concrete.

10

*Id.*; *see also Peat Marwick,* 565 So. 2d at 1326 ("Until the tax court determination, both the Lanes and Peat Marwick believed that the accounting advice was correct; consequently, there was no injury.").

With this understanding of *Kipnis* in mind, we turn to the particulars of the Gunthers' and Highpoint's disputes with the IRS.

### The dispute with the IRS

In October 2005, the IRS issued a Notice of Final Partnership Administrative Adjustment (FPAA) for the Gunthers and Highpoint's partnership in Arbitrage Trading. The IRS expressed its opinion that the partnership was "formed and availed of solely for purposes of tax avoidance" and that it "had no business purpose other than tax avoidance, lacked economic substance, and, in fact and substance, constitutes an economic sham for federal income tax purposes."

The IRS therefore proposed reducing to $0 the outside partnership basis reported by Arbitrage Trading. That same day, the IRS issued a notice of deficiency to the Gunthers for their 1999–2002 tax returns and to Highpoint for its 1999 return. These notices rejected the Gunthers' and Highpoint's claims in their respective 1999 tax returns of the premium amount of the long euro call option as partner outside basis because, among other reasons, they never actually expended that amount and because the partnership was a sham to avoid paying taxes.

In January 2006, the Gunthers and Highpoint filed petitions in the tax court challenging their notices of deficiency. On March 10, 2006, the Gunthers paid more than $2 million to the IRS. Three days later, Arbitrage Trading, through Gunther, filed a Complaint for Readjustment of Partnership Items in the United States Court of Federal Claims (the Arbitrage Action).

11

In May 2007, the parties to the Arbitrage Action, including the Gunthers, moved for an order staying the case pending the outcome of *Jade Trading, LLC v. United States*, which was also pending before the Court of Federal Claims. *Jade Trading* was a case further along in the litigation process that involved the very same players (BDO, Sentinel, AIG) using the very same tax strategy (i.e., the contribution of offsetting euro call options to a partnership (the Sentinel Transaction)). The *Jade Trading* court was set to decide whether the Sentinel Transaction had economic substance or was a mere sham. The Gunthers' attorney, David Aughtry (who was also Jade Trading's attorney), recommended that the Gunthers use *Jade Trading* as a "test case" and allow it to "go forward first." The parties ultimately stipulated that *Jade Trading* would result in "binding precedent which will largely dispose of this case."

In December 2007, the Court of Federal Claims issued its decision, holding that the Sentinel Transaction lacked economic substance. *Jade Trading, LLC v. United States*, 80 Fed. Cl. 11, 14 (2007), *aff'd in part, vacated in part, rev'd in part sub nom. Jade Trading, LLC ex rel. Ervin v. United States*, 598 F.3d 1372 (Fed. Cir. 2010). In March 2010, the United States Court of Appeals for the Federal Circuit affirmed with respect to that point. *Jade Trading, LLC ex rel. Ervin v. United States*, 598 F.3d 1372 (Fed. Cir. 2010), *abrogated on other grounds by Woods*, 571 U.S. at 31. The Federal Circuit summarized the strategy as follows:

> The [partners'] transfer of the spread transactions to Jade [the partnership] lacked economic substance. The [partners] purchased euro call options from AIG for a premium of $15,000,020 and sold euro options to AIG for a premium of $14,850,018. However, the [partners] paid AIG only the difference—a net premium of $150,002. After contributing the spread transactions to Jade and subsequently exiting the partnership, the [partners] claimed a basis of over $15 million in their Jade interests by including

only the cost of the purchased call option. As a result, the artificially inflated basis generated a purported $14.9 million tax loss.

598 F.3d at 1377. The partners' arrangement with Jade, therefore, was in all relevant respects an exact match with the Gunthers and Highpoint's arrangement with Arbitrage Trading. The Federal Circuit determined that the partners' loss was "purely fictional" and "the formation of the Jade partnership appears to have had no economic purpose" because "[t]he partnership did nothing to enhance the investment potential of the spread transaction." *Id.* (citing 80 Fed. Cl. at 45–46). "However, for tax purposes, it was imperative that the individual partners contribute the spread transactions to Jade to generate the artificially inflated bases." *Id.* (citing 80 Fed. Cl. at 46).

In October 2010, with the handwriting on the wall, Arbitrage Trading, through Gunther, stipulated that, among other things, "the statement of grounds" included in the IRS's FPAA—i.e., that Arbitrage Trading and the transactions in which it engaged was "a sham" and "lacked economic substance"—was correct.[3]

In October 2014, the Court of Federal Claims entered an amended final judgment against Arbitrage Trading. The court sustained the IRS's partnership-level adjustments (including reducing to $0 the outside partnership basis) but did not resolve issues falling outside its jurisdiction, namely, partner-level defenses to penalties and outside partner basis.

In November 2015, the IRS issued partner-level "Notice[s] of Deficiency" to the Gunthers and Highpoint that proposed forty-percent

---

[3] Arbitrage Trading has never tried to back out of the stipulation, and *none* of the poststipulation proceedings revisited whether the Sentinel Transaction was a sham.

penalties. In February 2016, the Gunthers and Highpoint filed petitions in the tax court asserting partner-level defenses (such as good faith reliance on their accounting and legal professionals) never decided in the prior litigation. The Gunthers' latest proceeding remained pending at the time of the briefing in this appeal. As far as we know, no adjustments have been finalized as to Gunthers' partner-level taxes or penalties owed. But the issue of whether the Sentinel Transaction lacked economic substance was established no later than 2010.

*The trial court's ruling*

In their 2017 lawsuit, the Gunthers argued that under *Kipnis*, the earliest that the statute of limitations could ever have begun to run was when the Court of Claims entered its final judgment in October 2014 in the *Arbitrage Trading* action. Indeed, the Gunthers and Highpoint affirmatively pled the applicability of *Kipnis* in their operative complaint,[4] which makes sense because they cannot possibly contend that they remained ignorant of otherwise accrued claims against Morgan Lewis all the way until 2013. By 2009, several of the tax executives (including those who allegedly orchestrated the false opinion) had already pled guilty to criminal tax fraud in connection with the scheme. And by 2009,

---

[4] In *Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404 (Fla. 2d DCA 2022), this court reversed an order granting Morgan Lewis's motion to dismiss the claims of the Estate of A. Scott Logan for failure to state a cause of action against Morgan Lewis. Although that opinion focused on the claims of Logan against Morgan Lewis, the Gunthers' and Highpoint's claims are relevantly similar to Logan's. On the same day that this court issued its opinion in *Logan*, it also issued its opinion in *Gunther v. Morgan, Lewis & Bockius LLP*, 348 So. 3d 1264 (Fla. 2d DCA 2022), which reversed the trial court's grant of Morgan Lewis's motion to dismiss the Gunthers' and Highpoint's claims, expressly adopting the reasoning in *Logan*. We refused to address the applicability of *Kipnis* at that stage in the proceedings. *See Logan*, 350 So. 3d at 415. Now, however, we have the benefit of a full summary judgment record.

BDO had even sued Morgan Lewis based in part on the work Morgan Lewis had performed for BDO's tax executives to facilitate the scheme. In 2012, when BDO entered into its deferred prosecution agreement with the United States Department of Justice, at least one Morgan Lewis attorney was identified as an unindicted coconspirator. Moreover, before 2013, multiple third parties had already sued BDO for fraud and breach of fiduciary duty based in part on the above conduct. Given this publicly available information (not to mention the Gunthers' and Highpoint's retention of lawyers to pursue possible claims several years before they filed this action), the Gunthers and Highpoint had no choice but to insist below that the statute of limitations did not begin to run until the IRS had obtained a judgment against them (or at least against their partnership, Arbitrage Trading).

The trial court rejected this argument based on all five of the factors identified in *Kipnis*. *See* 202 So. 3d at 862. The court determined that (1) there was no "ongoing, preexisting relationship" between the plaintiffs and Morgan Lewis that would have been "disrupt[ed]" if plaintiffs had sued earlier; (2) there was no need to "shield [plaintiffs] from having to argue inconsistent positions" because in 2010, after the decision in *Jade Trading*, the plaintiffs had stipulated that the Sentinel Transaction lacked economic substance; (3) even if the amount of the plaintiffs' inevitable tax penalty was as yet undetermined, they had already suffered concrete damages; (4) applying *Kipnis* would not conserve judicial resources because the plaintiffs were already pursuing litigation with the IRS on a dual track with litigation with Morgan Lewis; and (5) applying *Kipnis* on these facts would undermine the policies underlying the statute of limitations.

15

This court reviews de novo the trial court's grant of summary judgment. *Volusia County v. Aberdeen at Ormond Beach, L.P.*, 760 So. 2d 126, 130 (Fla. 2000). We likewise review de novo its conclusion that the Gunthers' and Highpoint's causes of action are barred by the statute of limitations. *Schmidt v. Sabow*, 331 So. 3d 781, 787 (Fla. 2d DCA 2021) (citing *Lexon Ins. Co. v. City of Cape Coral*, 238 So. 3d 356, 358 (Fla. 2d DCA 2017)). And here we conclude that the court got right what matters most: by the time the Federal Circuit had issued its opinion in *Jade Trading* determining that the Sentinel Transaction lacked economic substance and Arbitrage Trading had stipulated essentially that it was a sham, the Gunthers and Highpoint would never be able to claim successfully that the long euro call options contributed to Arbitrage Trading as partner outside basis, and therefore they could sue Morgan Lewis right away without having to take an inconsistent position.[5] *See Woods*, 571 U.S. at 42 (noting the "legal impossibility of any partner's possessing an outside basis greater than zero in a partnership that, for tax purposes, did not exist").

---

[5] We do, however, qualify somewhat our agreement with the trial court's resolution of the *Kipnis* factors. Because the Gunthers have sued Morgan Lewis for aiding and abetting and for conspiring with BDO, the court's consideration of the first factor should also have accounted for the impact that refusing to apply the finality accrual rule would have had on the Gunthers and Highpoint's relationship with BDO. By at least 2012, however, that relationship was over.

With regard to the last factor—whether application of the finality accrual rule would disserve the purpose of the statute of limitations—the supreme court explained in *Kipnis* that delaying the commencement of the statute of limitations can result in stale memories and inadvertent destruction of evidence, causing the defendant to be at a "grave disadvantage." 202 So. 3d at 866 (quoting *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1075 (Fla. 2001)). There's less reason to worry about that here, however, because BDO and Morgan Lewis have been sued repeatedly for the alleged underlying conduct.

16

Moreover, it was likewise sufficiently certain at that point that the Gunthers and Highpoint would owe back taxes, penalties, and interest—and that the out-of-pocket costs to participate in the Sentinel Transaction had been an utter waste of money—regardless of whether the exact amount of taxes, penalties, and interest remained for future determination. At a minimum, whether the Gunthers and Highpoint had been damaged was no longer hypothetical given the Federal Circuit's decision in *Jade Trading* and the stipulation based on that decision. *Cf. Kipnis*, 202 So. 3d at 863 (holding that the taxpayers' alleged damages did not become "real and concrete" but instead were "hypothetical and speculative" until the dispute with the IRS became final).

Finally, we address the Gunthers' contention that *Kipnis* imposes a "bright-line rule" in *all* tax shelter cases that the statute of limitations does not begin to run until the IRS obtains a judgment: we don't think it does. For one thing, the certified question that *Kipnis* answered for the Eleventh Circuit turned in part on the "facts in this case." 202 So. 3d 860. The supreme court then proceeded to analyze those facts in light of the multi-factor test that it formulated to determine whether the finality accrual rule should apply. *Id.* at 862–66. "Multi-factor tests" and "bright-line rules" don't generally keep company.

Moreover, although *Kipnis* referred to a "bright-line rule," *id.* at 865, it did so in reference to the Florida jurisprudence applying the finality accrual rule to legal malpractice claims, such as *Silvestrone*, 721 So. 2d at 1175. *See also, e.g., Larson & Larson, P.A. v. TSE Indus., Inc.*, 22 So. 3d 36, 41–44 (Fla. 2009) (holding that a client's cause of action for legal malpractice regarding an underlying judgment accrued and that the two-year limitations period began to run on that judgment when it became final thirty days after entry of trial court's order affirming jury

17

verdict, from which the client did not appeal); *Perez-Abreu, Zamora & De La Fe, P.A. v. Taracido*, 790 So. 2d 1051, 1054 (Fla. 2001) (holding that a malpractice cause of action accrues "when the client incurs damages at the conclusion of the related or underlying judicial proceedings or, if there are no related or underlying judicial proceedings, when the client's right to sue in the related or underlying proceeding expires" (quoting *Blumberg v. USAA Cas. Ins. Co.*, 790 So. 2d 1061, 1065 (Fla. 2001))). Indeed, *Silvestrone* itself declared that it set a "bright-line rule" for cases involving litigation-related malpractice. *See* 721 So. 2d at 1176. In contrast, after carefully analyzing the facts in light of the enumerated factors, the *Kipnis* court held "that the finality accrual rule applies *in this case*." 202 So. 3d at 866 (emphasis added).[6]

Simply put, no one needed to wait until the end of the *Arbitrage Trading* action in 2014, let alone the end of the subsequent partner-level actions (when that end ever comes), to know that the fight was lost as soon as Arbitrage Trading stipulated—following the decision in *Jade Trading*—that the Sentinel Transaction lacked economic substance. At that point, the only issue remaining was the amount—rather than the existence—of damages.

Because the finality accrual rule does not apply on this summary judgment record, we affirm the judgment below.

VILLANTI and MORRIS, JJ., Concur.

─────────────────────────

[6] The Gunthers and Highpoint insist that this court's decision in *Zakak v. Broida & Napier, P.A.*, 545 So. 2d 380 (Fla. 2d DCA 1989), in which we determined that the statute of limitations ran from a final judgment, rather than from an intermediate order in that matter, requires reversal in this case. *Zakak*, however, was an attorney malpractice action. *Id.* at 381.

Opinion subject to revision prior to official publication.